Samedi v New York City Health & Hosps. Corp. (2025 NY Slip Op 51067(U))

[*1]

Samedi v New York City Health & Hosps. Corp.

2025 NY Slip Op 51067(U)

Decided on July 1, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 1, 2025
Supreme Court, Kings County

Nathalie Samedi as Parent and Natural Guardian of N.R.M., an Infant, Plaintiff,

against
New York City Health and Hospitals Corporation, Defendant.

Index No. 533967/2022

Plaintiff
James P. Fitzgerald, Esq. ([email protected])
The Fitzgerald Law Firm, P.C.
538 Riverdale Avenue
Yonkers, NY 10705
914-378-1010
Defendant
Joe Benjamin Swart ([email protected])
Wilson Elser Moskowitz Edelman & Dicker LLP
150 East 42nd Street
New York, NY 10017
212-915-5483

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: Seq. 1: 18 — 20, 21 — 44
Seq. 2: 48 — 52, 53 — 73, 74 — 75, 76
Defendant, New York City Health and Hospitals Corporation ("NYCHHC") moves (Seq. No. 1) for an Order, pursuant to CPLR § 3212, granting summary judgment in its favor and dismissing all claims against it. Nathalie Samedi as Parent and Natural Guardian of N.R.M., an infant plaintiff, opposes the motion as to the care received during her labor and delivery on August 27, 2019. Plaintiff does not submit opposition to prenatal and postnatal care and during Oral arguments, plaintiff conceded that they would not oppose summary judgment as to those [*2]claims.
Plaintiff cross moves (Seq. No. 2) for an Order, pursuant to Gen. Mun. Law § 50-e (5), deeming the notice of claim upon the defendant timely served, nunc pro tunc. Defendant opposes this cross motion.
Plaintiff commenced this action on November 21, 2022, asserting claims of medical malpractice and lack of informed consent in connection with prenatal, postnatal, and labor and delivery treatment rendered to Nathalie Samedi at Kings County Hospital Center ("KCHC") allegedly causing injury to the infant plaintiff. Plaintiff alleges that infant plaintiff sustained birth-related physical and neurological injuries resulting in brain damage, global developmental delays, neurological/cognitive delays, motor delay, inability to live independently, diminished earning capacity, and loss of enjoyment of life.
Ms. Samedi was first treated at KCHC on March 22, 2019. Having missed a period, she was administered a pregnancy test that returned positive. Ms. Samedi received prenatal care at KCHC, estimating her date of confinement to be October 23, 2019. She presented to KCHC on August 27, 2019, with complaints of lower abdominal cramping of the last two days and decreased fetal movement. At that time, the fetus was approximately 31 weeks, 6 days gestation. Fetal heart monitoring began at approximately 10:15 a.m. and the Labor & Delivery triage nurse's initial assessment was timed at 10:31 a.m. The patient's blood pressure was 136/112 and fetal heart tracings were characterized with a baseline of 155 beats per minute. Ms. Samedi was examined by Dr. Ivrose Joseph, KCHC's obstetrical resident, at 11:13 a.m. and her blood pressure was recorded as 160-170/100 and was recorded later in the same attending note as 160/106. At 11:46 a.m. a 20 mg dose of Labetalol was administered via IV push and the steroid Betamethasone was administered for fetal lung development. At 12:10 p.m. the patient was admitted for a primary C-section due to non-reassuring fetal heart tracings and severe preeclampsia; her blood pressure was recorded at 188/104. At 12:26 p.m. a 40 mg dose of Labetalol was pushed via IV. The attending pre-operation note was timed at 12:30 p.m. and infant plaintiff was born at 1:42 p.m. by Cesarean section. A 25% placental abruption and clear amniotic fluid were noted following delivery.
The infant plaintiff was suctioned, placed in a warmer, and given positive pressure ventilation immediately. He was flaccid, with decreased tone and no ventilation, with an Apgar score of 3 at 1 minute. Infant plaintiff was intubated at 4 minutes of life, then received Apgar scores of 6 at 5 minutes and 8 at 10 minutes. The umbilical cord blood and blood gas were collected at 1:50 p.m. and a pH of 7.12 with a base deficit of -11.9 was recorded in the cord blood gas. Infant plaintiff was admitted to the NICU at 2:00 p.m. He had a respiratory rate of 69 and was hypotensive. His blood glucose levels were recorded at 3:08 p.m. to be less than 10 mg/dl.
Due to infant plaintiff's depressed condition at birth including lack of respiratory effort, flaccid muscle tone, and hypoglycemia, a head ultrasound was taken of infant plaintiff on August 30 and revealed an intraventricular hemorrhage. On September 10, a second ultrasound revealed a left-side grade 3 germinal matrix hemorrhage and a right-side grade 1 germinal matrix hemorrhage that decreased in size from the previous ultrasound. On September 28, the infant was discharged from KCHC. On October 19, non-party Lehigh Valley Children's Hospital performed an MRI upon infant plaintiff that led to a diagnosis of periventricular leukomalacia which is an injury to the white matter of the brain.
Plaintiff alleges that KCHC, through its physicians, departed from the standard of care by [*3]failing to timely deliver by Cesarean section and failing to obtain informed consent. Plaintiff further alleges that this departure proximately caused infant plaintiff to sustain physical and neurological injuries, including later diagnosed intraventricular hemorrhages and periventricular hemorrhages, resulting in infant plaintiff suffering from cerebral palsy and global developmental delays.
First addressing the late notice of claim, a notice of claim against a public corporation is required within 90 days after the claim arises pursuant to Gen. Mun. Law § 50-e. Plaintiff's claim arises from the care rendered on August 27, 2019. Plaintiff's 90-day period to serve a notice of claim upon NYCHHC expired on November 25, 2019. Plaintiff filed and served an untimely notice of claim on May 10, 2022. A 50-h hearing was held on September 9, 2022. Plaintiff then commenced this action on November 21, 2022 and filed the instant cross motion on May 2, 2025 to deem the notice of claim served upon Defendant timely nunc pro tunc.
"Courts have broad discretion to extend the 90-day time limitation 'in exceptional cases' upon consideration of all relevant factors, provided the statute of limitations of one year and 90 days has not already expired" (Jaime v. City of New York, 41 NY3d 531, 540 [2024]). "In determining whether to grant or deny leave to serve a late notice of claim, the court must consider in particular whether the municipality acquired actual knowledge of the essential facts constituting the claim within 90 days of the clam's accrual or within a reasonable time thereafter" (Jaime at 540). The court also considers other relevant facts and circumstances, particularly whether the petitioner "demonstrated a reasonable excuse for the failure to serve a timely notice of claim" and whether "the delay would substantially prejudice the municipality or public corporation in its defense" (Ibrahim v. New York City Tr. Auth., 202 AD3d 786, 787 [2d Dept 2022]). "The presence or absence of any one of these factors is not dispositive" (Balbuenas v. New York City Health & Hosps. Corp., 209 AD3d 642, 644 [2d Dept 2022], quoting Rodriguez v. Westchester Med. Ctr., 196 AD3d 659, 660 [2d Dept 2021]). Plaintiff bears the prima facie burden of presenting at least "some evidence or plausible argument that supports a finding of no substantial prejudice" (Newcomb v. Middle County Cent. School Dist., 28 NY3d 455, 466 [2016]). Once this burden is met, the opposing party must make a particularized showing that they would be substantially prejudiced by the late notice of claim.
When the application is made after the statute of limitations has expired, the court no longer has discretion to deem the notice of claim timely under Gen. Mun Law § 50-e (5). CPLR § 208 provides that the statute of limitations is tolled through the period of infancy, but such toll is limited to 10 years in Medical Malpractice actions (see Rojas v. Tandon, 208 AD3d 702, 703 [2d Dept. 2022]; Matter of Daniel J. v. New York City Health and Hospital Corp., 77 NY2d 630, 634 [1991]).
Regarding the infancy of the infant Plaintiff himself as it pertains to the late notice of claim, Gen. Mun. Law § 50-e (5) requires all "relevant facts and circumstances" be considered in a court's discretion. The Court of Appeals has held that "a nexus between infancy and delay, while not a requirement, remains a statutory factor that a court should take into account" when weighing the factors (Williams v. Nassau County Medical Center, 6 NY3d 531, 538 [2006]). As such, the "causative relationship between infancy and the delay was a matter committed to the court's discretion, in view of the circumstances in a given case" (Williams at 538). When weighing infancy under these guidelines, the Second Department emphasized the importance of considering the fact that the plaintiff was "an infant at all relevant times" (B.J. v. New York Housing Authority, 236 AD3d 1001, 1003 [2d Dept 2025]). Here, infant plaintiff was and still is [*4]an infant at all times relevant to the instant claim. The claim arose at the time of his birth and he is now shy of six years old. Additionally, Plaintiff has shown through deposition and submissions that her delay is linked to the infancy of the child and the difficulty and requirements of his care. In a personal affirmation, Plaintiff demonstrated that shortly after the child's birth, they moved to Massachusetts and then to Pennsylvania. where infant plaintiff was treated at Boston Children's Hospital and then Lehigh Valley Hospital respectively. Plaintiff states that since the child's birth she has taken him to his required therapies including physical, speech, feeding, and occupational therapy. She avers that these circumstances surrounding the child's infancy and his disabilities were connected to the delay in filing a notice of claim as infant plaintiff requires "much more care than a normal child of his age." The Court accepts this explanation and finds that the Plaintiff has sufficiently shown a nexus between the infancy of the child and the delay in filing the notice of claim.
The Second Department has held that "[w]hile the presence or the absence of any one of the factors is not necessarily determinative, whether the municipality had actual knowledge of the essential facts constituting the claim is of great importance'" (Wieman-Gibson v. County of Suffolk, 206 AD3d 666, 667 [2d Dept 2022], citing Matter of Snyder v. County of Suffolk, 116 AD3d 1052, 1053 [2d Dept 2014], quoting Matter of Placido v. County of Orange, 112 AD3d 722, 723 [2d Dept 2013]). Actual knowledge may be established by sufficiently proving "knowledge of the facts that underlie the legal theory or theories on which liability is predicated in the notice of claim" (Matter of Government Empls. Ins. Co. v. Suffolk County Police Dept., 152 AD3d 517, 518 [2d Dept 2017]; see Matter of Felice v. Eastport/South Manor Cent. School Dist., 50 AD3d 138, 148 [2d Dept 2008]).
On the actual knowledge factor, Defendant argues in opposition that Plaintiff fails to meet their burden because possession of the pertinent medical records alone does not per se constitute actual knowledge. Medical records can establish actual knowledge of the "essential facts constituting a claim where they 'evince that the medical staff, by its acts or omissions, inflicted an injury on the plaintiff'" (Cleary v. Nassau Health Care Corp., 215 AD3d 958, 959-960 [2d Dept. 2023], quoting Wally G. v. New York City Health and Hospital Corp., 27 NY3d 672, 677 [2016]). In Moody-Dubois, the court noted that the defendant hospital acquired actual knowledge of the essential facts constituting the underlying claim since "its employees participated in the acts or omissions giving rise to the claim and prepared medical records from which it could be readily inferred that [defendant]'s employees inflicted injury by deviating from standard medical practices" (Moody-DuBois v Westchester Med. Ctr., 238 AD3d 733 [2d Dept 2025]). The Second Department held that the defendant hospital had actual knowledge of the essential facts of the birth complications which led to the underlying claim as defendant's employees participated in the delivery and developed the corresponding medical records that showed a "hematoma, low heart rate, low respiratory effort, discoloration, low body temperature, and low blood pressure" (Id.).
Similarly in Rodriguez v. Westchester Medical Center, the Plaintiff's untimely notice of claim filed 30 months after the alleged malpractice, claimed a failure to timely deliver by Cesarean section (Rodriguez v Westchester Med. Ctr., 196 AD3d 659, 660 [2d Dept 2021]). There, the Second Department found the defendant hospital had actual knowledge "by virtue of the hospital records pertaining to the labor and delivery of the infant which indicate that there was a delay in performing a Cesarean section after there was evidence of fetal distress which caused injury to the infant" (Id.).
Here, the Court finds the medical records developed and maintained by KCHC employees were sufficient to provide Defendant with actual knowledge of the essential facts of the instant claim pertaining to the labor and delivery of August 27 and alleged injuries to the infant plaintiff. The notes pertaining to the labor and delivery recorded details of the Ms. Samedi's pre-term labor, pre-eclampsia and fetal tracings. As in Moody-Dubois, Defendant's employees participated in the delivery noting, among other issues, severe pre-eclampsia in the patient. The timing of the C-section in relation to the physical condition of the mother are noted in the record. The medical record documents the various medical issues affecting of the newborn which are claimed to have resulted from his birth. The infant's Apgar scores, which evinced his low respiratory effort, discoloration, low body temperature, and his low blood sugar and ultrasound findings are all contained in the infant's birth record. Additionally, his fetal heart tracings, cord blood gas pH and Base deficit levels, and ultrasounds are also part of the medical record. All of these recordings, test results and notes form the basis for Plaintiff's claims in this case. In sum, the labor and delivery record, as well as the infant's medical record serves to give notice of the essential facts constituting Plaintiff claims including delay in performing a C-section and serves as notice of an alleged injury to infant plaintiff.
Plaintiff argues that she had a reasonable excuse for the delay in serving notice of claim. In her personal affirmation, Plaintiff details her inability to timely file notice of claim due to the need to take the infant to medical evaluations and treatment. As previously noted, in January 2020, Plaintiffs moved to Massachusetts and infant plaintiff was seen at Boston Children's Hospital. In July of that year, they moved to Pennsylvania and the infant was treated at Lehigh Valley Hospital. Plaintiff additionally avers that her primary concern has always been in her child's necessary medical care and support and not in filing a lawsuit. She states that she was initially unaware of the potential causes of her child's injuries. She also mentions that her first language is Haitian Creole. Plaintiff explains that infant plaintiff suffers from microcephaly, developmental delays, cerebral palsy and spastic quadriplegia, and that as such, the child cannot use his arms or legs, is not toilet trained, and requires care for even the most basic needs. Infant plaintiff attends special education classes and receives physical, speech, feeding, and occupational therapy. Plaintiff expands that the child still cannot speak except for a few, unclear words and thus cannot communicate effectively.
Notwithstanding Defendant's argument that this excuse does not justify delay of over 30 months, Defendant acknowledges "[c]ourts have held that this is a reasonable excuse" (see Guzman, 208 AD2d 295 [2d Dept 1994]). Indeed, the Court finds that Plaintiff has demonstrated a reasonable excuse for the delay in these circumstances. The Second Department has held that the delay of a mother being "preoccupied with her [child]'s medical condition and treatment" may constitute a reasonable excuse for failure to file a timely notice of claim (Matter of Guzman v. County of Westchester, 208 AD2d 295, 295 [2d Dept 1994]). Here, the court accepts as reasonable Plaintiff's excuse that the delay was due to her preoccupation with infant plaintiff's medical conditions and with the treatment necessary for the infant's care.
Plaintiff also argues that Defendant would not be prejudiced by the late notice of claim. It is not disputed that the untimely notice of claim was filed on May 10, 2022, approximately two and a half years after the 90-day deadline of November 25, 2019. Plaintiff argues that there is no prejudice to Defendant because "the case has been fully litigated." Plaintiff elaborates that all medical depositions, including plaintiff's own appearance were completed without hardship. Plaintiff therefore argues that the delay would not and has not prejudiced Defendant in the [*5]defense of this action, or in the discovery of the underlying claim, or as to opposing the action on its merits. Considering these circumstances, the Court finds that Plaintiff presents at least "some evidence or plausible argument that supports a finding of no substantial prejudice" (Newcomb, at 466).
Defendant argues in opposition that the delay has "by its very nature" deprived Defendant of the ability to "to timely investigate, collect evidence, and evaluate the merits of a claim while the facts are still 'fresh.'" However, Plaintiff convincingly argues in reply that Defendant fails to identify any "witness or piece of evidence" made unavailable due to the delay or any other form of prejudice suffered by the Defendant because of the delay in the instant case. Indeed, it is noted that discovery is complete, including depositions. Defendant therefore fails to provide a showing of "particularized evidence demonstrating that it would be substantially prejudiced by the delay" between November 25, 2019, and the untimely notice on May 10, 2022 (Davis v. Inc. Vil. of Laurel Hollow, 195 AD3d 1019 [2d Dept 2021], citing Newcomb, at 466).
As Plaintiff has demonstrated the applicability of the infancy toll for notice of claim purposes, actual knowledge, a reasonable excuse for the delay, and a lack of substantial prejudice, the Court grants Plaintiff's request to deem the notice timely nunc pro tunc. Accordingly, Plaintiff's cross motion (Seq. No. 2) is GRANTED and the notice of claim dated May 10, 2022 (NYCEF # 23) is deemed timely filed and served.
Turning to the summary judgment motion, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure. Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (Rosenzweig v. Hadpawat, 229 AD3d 650, 652 [2d Dept 2024] [internal quotation marks and citations omitted]). However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v. Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
In support of this motion, NYCHHC submits an expert affirmation by Gary Mucciolo, M.D. ("Dr. Mucciolo"), a licensed physician certified in Obstetrics and Gynecology.
Dr. Mucciolo opines that all of the obstetrical care rendered by the defendant to the plaintiffs complied with the accepted standard of care. Specifically, regarding the fetal heart tracing strips beginning at 10:16 a.m., Dr. Mucciolo opines that they demonstrate a baseline fetal heart rate of 135, with a minimal variability, and no accelerations or late decelerations. Dr. Mucciolo opines that the fetal heart tracing was a Category II tracing. Specifically, he opines that the possible decelerations at 10:57 a.m., 11:21 a.m., 11:37 a.m., 11:41 a.m., 12:34 p.m., and 12:51 p.m. have a good return to baseline and constitute a Category II tracing. He also opines that this was not a Category III tracing because the required recurrent late decelerations, recurrent variable decelerations, bradycardia, or a sinusoidal fetal heart pattern are absent. Dr. Mucciolo additionally opines that a Category II tracing is "not a reason for an emergent C-section delivery alone" and can be monitored without need for immediate delivery if it "remains stable with no sign of fetal injury."
Dr. Mucciolo therefore opines that it was within the standard of care for Dr. Short to administer the two doses of Labetalol and the Betamethasone and to wait to allow them to take [*6]effect prior to proceeding with the Cesarean section. Dr. Mucciolo opines that the 20 mg dose of Labetalol administered at 11:46 a.m., followed by an observation period, was appropriate given Plaintiff's blood pressure of 160/106 at the time. Further, Dr. Mucciolo opines that the 40 mg dose administered at 12:26 p.m. was appropriate given the Plaintiff's continued elevated blood pressure of 188/104 at 12:10 p.m. Dr. Mucciolo opines that it was within the standard of treatment to administer 2 doses of Labetalol before proceeding with a Cesarean section, and further opines that waiting before proceeding to emergency Cesarean section by the clinical discretion of Dr. Short was within the standard of care.
Dr. Mucciolo further opines that the administration of Betamethasone and Magnesium Sulfate were within the standard of care. He opines that given the increasing likelihood of an unavoidable Cesarean section, that the administration of a steroid to promote fetal lung development was appropriate. Further, he opines the administration of Magnesium sulfate to prevent maternal seizures and the wait for it to take effect was within the standard of care.
On the issue of proximate causation, Dr. Mucciolo attributes an ischemic injury occurring days prior to Plaintiff's presentation at KCHC to be the cause of infant plaintiff' physical and neurological injuries. He opines that the clarity of the amniotic fluid at the time of birth despite a 25% abruption indicated that the ischemic event occurred more than hours prior to birth because the blood had enough time to filter from the fluid. He further opines that the cord blood gas pH had a level of 7.12 with a base excess of 11.9 and that these values are borderline, thus indicating that the infant plaintiff had time to compensate from the ischemic event, which he opines had to have occurred days earlier.
The movants also submit an expert affirmation from Joseph Maytal M.D. ("Dr. Maytal"), a licensed physician certified in Pediatrics, Neurology, and Psychiatry.
Dr. Maytal opines that all of the pediatric and pediatric neurological care rendered to infant plaintiff complied with the accepted standard of care. He opines that the immediate post birth care to infant plaintiff including the immediate warmer and intubation; the dextrose IV drip; the administration of surfactant at three hours of life; and the administration of Vitamin K and erythromycin in the NICU chart timed 3:20 p.m. complied with the standard of care.
As a pediatric neurologist, Dr. Maytal further opines on the causation of infant plaintiff's physical and neurological injuries including the cerebral palsy, spasticity in all four extremities, secondary microcephaly, the intraventricular hemorrhages, and the periventricular hemorrhages. Dr. Maytal directly attributes these conditions to the fact that infant plaintiff was born at less than 32 weeks gestation. Specifically, he opines that the hemorrhages are attributable to the "intrinsic fragility of the germinal matrix" of a premature newborn coupled with "respiratory and hemodynamic instability."
Dr. Maytal additionally opines that the infant plaintiff's blood cord gas had a pH level of 7.12 and a base excess of 11.9 and opines those levels to be only slightly outside of the normal range. Dr. Maytal opines that minimal deviation from the normal pH and base excess ranges resulted from an intrauterine ischemic event occurring days prior to Plaintiff's presentation to KCHC on August 27. Specifically, Dr. Maytal opines that the deviation being "only minimally outside the normal range" suggests that infant plaintiff "was beginning to compensate" for an intrauterine ischemic event that occurred days before, because the process of compensation "would have taken several days."
Based on these submissions, movant has established prima facie entitlement to summary judgment. KCHC has proffered expert opinions that the fetal heart tracings constituted a [*7]Category II tracing that did not demand immediate emergency delivery. The movant also established that the administration of Labetalol, Betamethasone, and Magnesium sulfate and the corresponding waiting periods for them to take effect prior to delivery, followed by an emergency Cesarean section were appropriate and that it was within the standard of care to stabilize the mother's blood pressure with such means before delivery.
KCHC has also established prima facie that no departure from the standard of care was a proximate cause of infant plaintiff's injuries, opining that infant plaintiff's cerebral palsy, spasticity in all four extremities, secondary microcephaly, intraventricular hemorrhages, and periventricular hemorrhages were an unavoidable outcome of an event prior to August 27 and the prematurity of the infant before 32 weeks gestation.
In opposition to the motion, Plaintiff submits an expert affirmation from Bruce L. Halbridge, M.D. ("Dr. Halbridge"), a licensed physician certified in Obstetrics and Gynecology.
Dr. Halbridge opines that the fetal heart tracings as of the 10:31 a.m. triage assessment have a baseline of 155 beats per minute with a visible deceleration to 132 beats per minute. Dr. Halbridge further opines that this was not a Category II tracing because "there is absent (not minimal) variability at that time; the tracing is virtually a straight line." Therefore, Dr. Halbridge opines that this was actually a Category III tracing, indicating hypoxic risk to the fetus and acidosis. He opines that from the beginning of fetal hart monitoring at 10:16 a.m. until the monitor is discontinued at 1:01 p.m., there is a "lack of variability" in the fetal heart rate and further, that this was acknowledged by the attending note at 11:53 a.m. which described "no variability" in the fetal heart rate. Dr. Halbridge further opines that having no variability is the definition of a Category III tracing and therefore this was a Category III tracing from the outset.
Dr. Halbridge opines that given the presence of a Category III tracing, good and accepted standards of care require that the infant be delivered by emergency Cesarean Section by no later than 30 minutes from the outset of the tracing. Dr. Halbridge opines that by Dr. Short's delaying the delivery by emergency Cesarean section in order to administer Labetalol and Betamethasone and to wait for them to take effect, KCHC departed from good and accepted standards of care.
Dr. Halbridge further opines that despite the call to deliver via emergency Cesarean section occurring at 12:10 p.m., KCHC operated with no urgency despite the emergency situation, infant plaintiff was not delivered until 1:42 p.m. He opines that "severe preeclampsia and NRFHR (Non-reassuring Fetal Heart Rate)" constitutes an emergency situation and that the call for an emergency delivery under such conditions would mandate delivery in less than twenty minutes according to good and accepted standards of care. Because infant plaintiff was not delivered until more than an hour later, Dr. Halbridge opines that this delay constitutes an "egregious" departure from good and accepted standards of care.
On the issue of proximate causation, Dr. Halbridge counters Dr. Mucciolo's opinion that infant plaintiff's physical and neurological injuries are attributable to an intrauterine ischemic event that occurred days prior to Plaintiff's presentation to KCHC on August 27. He opines that infant plaintiff's being severely depressed at birth, fetal heart tracings, pH and Base deficit of cord blood gas, and clear amniotic fluid with a 25% placental abruption at the time of birth are not consistent with an intrauterine ischemic event occurring days prior to August 27. Therefore, Dr. Halbridge opines that "all of the medical evidence indicates" that infant plaintiff's injuries are due to an intrauterine hypoxic insult in the hours preceding birth.
Plaintiff also submits an expert affirmation from Stephen J. Thompson, M.D. ("Dr. Thompson"), a licensed physician certified in Pediatrics and Neurology.
Dr. Thompson concurs with Dr. Halbridge that the cause of infant plaintiff's physical and neurological injuries was a severe in utero hypoxic insult occurring during the time of the delivery. He further opines that infant plaintiff's multiple organ failures at birth including the lungs, brain, and liver were caused by an event at the time of delivery or close to it. Dr. Thompson thus disagrees with Dr. Mucciolo regarding the intrauterine event occurring days prior to August 27 and opines that the severity of infant plaintiff's hypoglycemia at the time of birth "absolutely refutes" Dr. Mucciolo's opinion that the event occurred days prior.
Dr. Thompson also counters Dr. Maytal's opinion that infant plaintiff's pH was slightly elevated, indicating a mild metabolic acidosis and opines instead that infant plaintiff's pH was severely acidotic. He opines that infant plaintiff's pH of 7.12 was significantly acidic, indicating that the acidosis was not mild at all as a normal blood pH would be between 7.38 and 7.42; contesting Dr. Maytal's description of 7.0 to be considered normal. Dr. Thompson additionally contests Dr. Maytal's opinion that infant plaintiff's injuries are directly related to being born at approximately 32 weeks gestation, specifically opining that 32 weeks is not extremely premature and would not result in such injuries in the absence of other complications. Rather, he opines that acidosis was the actual cause of infant plaintiff's injuries.
To introduce an issue of fact, Plaintiff must provide expert affirmations that are not speculative or conclusory. "In order not to be considered speculative or conclusory, expert opinions in opposition should address specific assertions made by the movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record" (Avgi v. Policha, 232 AD3d 838, 840 [2d Dept 2024], quoting Tsitrin v. New York Community Hosp., 154 AD3d 994, 996 [2d Dept 2017]). The Court finds the opinions of Plaintiff's experts were sufficiently detailed, supported by the record, and countered the specific assertions of Defendant's experts. Dr. Halbridge and Dr. Thompson based their opinions, in part, upon the baseline records of the fetal heart monitoring strips, the pH and base deficit levels of the blood cord gas, the absence of blood in the amniotic fluid as well as infant plaintiff's depressed condition at the time of birth, including lack of respiratory effort, flaccid muscle tone, and hypoglycemia. Therefore, contrary to the movant's argument in reply, Plaintiff's expert affirmations were not conclusory or unsupported by the record. Regardless, any discrepancy in the consistency of the expert opinions regarding the causation of infant plaintiff's injury presents an issue of fact requiring the resolution of a jury.
Based on the submissions, Plaintiff has raised multiple issues of fact sufficient to defeat the motion for summary judgment. The experts set forth conflicting opinions regarding the appropriateness within the standard of care of administering Labetalol, Betamethasone, and Magnesium Sulfate and waiting for them to take effect rather than moving immediately to emergency Cesarean section given infant plaintiff's fetal heart tracings and Plaintiff's preeclampsia.
Plaintiff has additionally raised issues of fact sufficient to defeat Defendant's prima facie showing on proximate causation by offering a conflicting expert opinion as to whether the injuries such as the intraventricular and periventricular hemorrhages could have been caused by an intrauterine event days prior to August 27. As these issues of fact and credibility must be resolved by a jury, Defendant's motion for summary judgment is granted only to the extent of the claims related to prenatal and postnatal care, and summary judgment is otherwise denied.
Accordingly, it is hereby:
ORDERED that the cross motion (Seq. No. 2) for an Order, pursuant to Gen. Mun. Law [*8]§ 50-e, deeming notice of claim timely nunc pro tunc, is GRANTED; and it is further
ORDERED that the notice of claim dated May 10, 2022 is deemed timely filed and served nunc pro tunc; and it is further
ORDERED that defendant NYCHHC's motion (Seq. No. 1) for an Order, pursuant to CPLR § 3212, granting summary judgment in its favor and dismissing all of Plaintiff's claims against it, is GRANTED TO THE EXTENT of dismissing Plaintiff's claims regarding prenatal and postnatal care, and the motion is otherwise DENIED.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.